UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,

                                    **REPORT AND**

         **-against-**                       **RECOMMENDATION**

MORDECAI ABRAHAM SORCHER and
SROYA SORCHER,                            **05-CR-799 (NG)**

                      **Defendants.**
----------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

      Currently pending before this Court, on referral from the Honorable Nina Gershon, is a

motion filed by defendants Mordecai Abraham Sorcher ("Sorcher") and Sroya Sorcher

(collectively, "defendants") to suppress evidence obtained without a warrant from the Yeshiva

Gedolah Academy ("YGA"), a nonprofit private educational institution, on December 27,

2000. On February 6, 2007, this Court held an evidentiary hearing, at which the government

called one witness, New York State Department of Education ("DOE") employee Sandra

Sheedy ("Sheedy"), who conducted an on-site inspection of YGA on December 27, 2000.

Defendants called Ruth Franklin ("Franklin"), a DOE trainee also present during the review.

      Having found Sheedy's testimony to be wholly credible, and having considered all of

the evidence, as well as the parties' pre-hearing and post-hearing submissions, this Court

recommends that defendants' motion be denied, for the reasons discussed below.

## FACTUAL BACKGROUND

      Pursuant to the National School Lunch Act, 42 U.S.C. § 1751, and the Child Nutrition

Act of 1966, 42 U.S.C. § 1771, the Food and Nutrition Service of the United States

Department of Agriculture ("USDA") is responsible for implementing the National School

Breakfast and Lunch Program (collectively, "the Program"), which provides bulk food products and funding to assist nonprofit schools in serving nutritious meals. See Transcript of Suppression Hearing dated February 6, 2007 ("Tr."), at 11; 7 C.F.R. §§ 210 (lunch program), 220 (breakfast program). In New York, the Program is administered by the DOE. See Tr. at 11-12; see also 7 C.F.R. §§ 210.2 (defining "State agency"), 210.3(b), 220.2(z), 220.3(b). Federal regulations require participating schools to maintain documents related to reimbursement claims and to make them available to the USDA or the relevant state agency (here, the DOE) on request. Tr. at 15; 7 C.F.R. §§ 210.9(a)(17)-(19); 220.7(e)(13)-(14). The regulations governing the School Lunch Program further charge the state agency to conduct on-site reviews of each participating school at least once every six years, see 7 C.F.R. §§ 210.18(b)(1), (c)(1), and the DOE conducts periodic on-site inspections as part of its standard operating procedure. See Tr. at 12, 37, 167.

In 1991, Sorcher executed a written agreement to enroll a branch of YGA (located at 2261 Bragg Street, Brooklyn, NY) in the Program. Tr. at 24.[1] Thereafter, YGA submitted annual renewal forms that continued the Bragg Street branch's enrollment in the Program through the 2000-2001 school year. See Tr. at 40-42; Govt. Exs. 2(a)-(I).[2]

On or about November 6, 2000, Sheedy sent a letter to YGA at the Bragg Street

---

[1] The government offered into evidence a signed copy of a School Breakfast Program Agreement. Govt. Ex. 1. Sheedy was unable to locate a copy of the School Lunch Program Agreement, which she believed had been purged as a result of the DOE's seven-year document retention policy. Tr. at 22, 26-27.

[2] As detailed hereinafter, see infra p. 9-11, this Court rejects defendants' contention that YGA's participation in the Program ended at the conclusion of the 1999-2000 school year.

address, stating that she planned to conduct an administrative review on December 27, 2000 at 8:30 a.m. (the "11/6/00 Letter"); appended to the letter was a checklist indicating which documents (pertaining to the month of September 2000) YGA should provide to the reviewers upon their arrival (the "Checklist").  See Tr. at 52-56; Govt. Exs. 5(a), 5(b).

Prior to her visit, Sheedy attempted to contact a YGA representative via telephone to confirm the date, but she received no response.  Tr. at 56, 154.  Sheedy then contacted Sandy Fruhling ("Fruhling"), an employee of YGA's consultant, the Board of Jewish Education ("BJE"),[3] who subsequently informed her that there had been a fire at 2261 Bragg Street and that the school had relocated to 2102 Avenue T in Brooklyn.  Id. at 56-57, 145.  Fruhling also advised that she had spoken with someone at the Avenue T location and confirmed that the school was prepared for Sheedy's review.  Id. at 145.

Sheedy's testimony – which was uncontradicted – established the following facts with respect to the administrative review:[4]  On arriving at the Avenue T location at approximately 8:00 a.m. on December 27, 2000, Sheedy and Franklin entered the school and encountered Sorcher on the first floor, where he was in prayer with several of the students.  Id. at 59.[5]

---

[3]  BJE acts as a consultant with private Jewish schools, and assists with their submission of reimbursement claims and preparation for administrative reviews.  Tr. at 164-65.

[4]  Franklin's testimony as to her involvement in the review was unilluminating, as she could not recall many of the details of the inspection. Furthermore, Franklin's testimony was not inconsistent with Sheedy's account of the events of the day.  See Tr. 195-204.

[5]  Co-defendant Sroya Sorcher was not present on the day of the review.  See Tr. at 170. Although there was no testimony as to his involvement with YGA, the superseding indictment charges that Mordecai Abraham Sorcher acted as director and Sroya as president.  See Superseding Indictment filed March 19, 2007 ("Superseding Indictment") ¶ 11.

Sorcher made a gesture to Sheedy and Franklin indicating that they should wait in the basement of the facility, and they did so. Id. at 59-60.[6] Shortly thereafter, at around breakfast time, Sorcher brought Sheedy and Franklin several manilla envelopes containing documents that Sorcher represented as responsive to Sheedy's request, in addition to a copy of the Checklist she had sent with the 11/6/00 Letter. Id. at 61-62, 92-94, 171. The documents (which all related to September 2000) included applications for free and reduced price school meals, which documents are supposed to be filled out by the head of the family of each student seeking to participate in the Program, certifying the family's income level and number of family members; Sheedy noted that the applications were in pristine condition, and all appeared to have been completed in the same handwriting. Id. at 63-64; Govt. Exs. 6, 14.[7] In addition, although DOE's records for September 2000 reflected that approximately eighty YGA students were enrolled in the Program, Sheedy observed only fifteen at the site, and concluded from her observations that the facility could not accommodate eighty. Tr. at 84, 87-88.[8]

At lunch time, Sorcher called off names of students in the dining room, which names

_____

[6] Based on her prior experience with Jewish schools, Sheedy was aware that rabbis are not supposed to speak during prayer. Tr. at 59-60. Sheedy stated that in similar circumstances the rabbi would gesture for her to wait in a certain location until the completion of the prayer service. Id.

[7] Sheedy therefore concluded that it was improbable that the students had brought them home for their families to sign, as the Program requires. Tr. at 63-64.

[8] Sheedy also noted that, despite the inclusion of preschool students on the roster, no preschool-age children were in attendance, nor did the facility have any furniture or equipment suitable for preschool students. Tr. at 87-88.

did not appear on the September rosters in the packet of materials in Sheedy's possession; when asked to locate those names on the rosters, Sorcher was unable to do so. Id. at 88-89. In accordance with DOE policy, Sheedy then requested Program documents pertaining to October, November and December 2000 (up to the date of the search). Id. at 89. Sorcher replied that those documents (including ones relating to the day prior to the inspection) were kept at the "burned-out" Bragg Street location. Id. at 89, 172. Although Sheedy offered to accompany Sorcher to the Bragg Street location to retrieve the additional documents, he was either unable or unwilling to do so. Id. at 89, 172. Sheedy then asked Sorcher to provide her with the additional documentation by the end of the day, to no avail; instead he protested that she had no right to any documents other than those for September. Id. at 89, 94. Sheedy inferred from these circumstances that "there was something wrong." Id. at 89.

At the end of the visit, Sheedy asked Sorcher to send her the additional Program documentation and told him that she was planning to take the September documents that he had given her to review. Id. at 94, 193. Sheedy felt that removing the September documents was her only option because YGA did not have a copy machine, and if she had left the documents behind, she "didn't feel confident that they would be there if I went back." Id. at 95-96. Sorcher did not respond to Sheedy's comment, and did not ask for the return of the documents. Id. at 95, 193. Sheedy and Franklin left YGA with the documents at approximately 2:30 or 3:00 p.m. Id. at 88.

Defendants were subsequently charged, in a five-count indictment and, thereafter, a five-count superseding indictment, with conspiracy to defraud the School Breakfast and Lunch

Program in violation of 18 U.S.C. § 371; School Breakfast and Lunch Program fraud in violation of 42 U.S.C. § 1760(g); and three counts of making a fraudulent claim in a matter within the jurisdiction of the Executive Branch in violation of 18 U.S.C. § 1001(a)(2). <u>See</u> Superseding Indictment.[9] Defendants moved to suppress the documents taken from YGA, contending that the warrantless search violated defendants' Fourth Amendment rights. <u>See</u> Defendant Mordecai Abraham Sorcher's Memorandum of Law and Fact in Support of Pre-Trial Motions ("Def. Mem.") at 17-18; Letter to Judges Gershon and Mann dated November 28, 2006, from Jan A. Rostal, Esq., at 2-3; Letter to Judge Mann dated February 20, 2007, from Lawrence Mark Stern, Esq. ("2/20/07 Stern Letter"); Letter to Judge Mann dated March 20, 2007, from Lawrence Mark Stern, Esq. ("3/20/07 Stern Letter"). The government opposed the defense motion, arguing that Sorcher consented to the search, or, in the alternative, that the search was valid under the administrative search exception. <u>See</u> Government's Opposition to Defendant Mordecai Abraham Sorcher's Pre-Trial Motions ("Govt. Opp. Mem.") at 20-22; Letter to Judge Mann dated February 6, 2007, from Daniel D. Brownell, Esq.

<u>**DISCUSSION**</u>

**A. The On-Site Inspection**

Arguing that YGA was not enrolled in the Program at the time of the search, defendants challenge the government's reliance on the administrative exception to the warrant

---

[9] Prior to the filing of the superseding indictment, Judge Gershon dismissed the three original false-statement counts on statute of limitations grounds, and requested supplemental briefing on the second count. <u>See</u> Order dated February 9, 2007. The parties are currently briefing the statute of limitations issues. <u>See</u> Order dated March 15, 2007.

requirement.  Def. Mem. at 18; Tr. at 218-19.  Defendants further contend that defendants did

not consent to Sheedy and Franklin's entry on the premises.  Def. Mem. at 17; Tr. at 219-20.

Defendants' arguments are unavailing.

### 1.  The Administrative Search Exception

It is well-established that, like private homes, commercial premises are granted

protection under the Fourth Amendment from unreasonable searches and seizures, see New

York v. Burger, 482 U.S. 691, 699 (1987), and that this rationale applies to not-for-profit

schools.  Cf. Doe v. Heck, 327 F.3d 492, 511-12 (7th Cir. 2002) ("[B]y their very operation,

private schools exhibit a subjective expectation of privacy in their premises."); Blackwelder v.

Safnauer, 689 F.Supp. 106, 139 (N.D.N.Y. 1998); Simpson v. Saroff, 741 F.Supp. 1073,

1078-79 (S.D.N.Y. 1990).  Nevertheless, in view of the fact that "the expectation of privacy

that the owner of commercial property enjoys in such property differs significantly from the

sanctity accorded an individual's home," the Supreme Court has recognized that "this privacy

interest may, in certain circumstances, be adequately protected by regulatory schemes

authorizing warrantless inspections."  Donovan v. Dewey, 452 U.S. 594, 598-99 (1981).

For a warrantless inspection to fall within the administrative search exception to the

warrant requirement, the commercial premises must be part of a "closely regulated industry,"

assessed based on "the pervasiveness and regularity of the federal regulation."  Burger, 482

U.S. at 701 (citing Donovan, 452 U.S. at 600) (internal quotations omitted); see also Meserole

St. Recycling v. City of New York, No. 06 Civ. 1773(GEL), 2007 WL 186791, at *3

(S.D.N.Y. Jan. 23, 2007).  Even where the premises fall within this category, warrantless

regulatory inspections are deemed reasonable only where three criteria are met: (1) the regulatory scheme must serve a "substantial government interest"; (2) "the warrantless inspections must be necessary to further the regulatory scheme"; and (3) the regulations "must provide a constitutionally adequate substitute for a warrant," by "advis[ing] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and [by] limit[ing] the discretion of the inspecting officers." Burger, 482 U.S. at 702-03 (internal quotations omitted).

The defense conceded during oral argument that schools that participated in the Program were part of a closely regulated industry, that the scheme was informed by a substantial governmental interest, and that warrantless regulatory reviews were necessary to further the regulatory scheme. Tr. at 214-15. The defense further acknowledged that federal regulations implementing the Program served to place participating institutions on notice that they were "subject to these kinds of inspections," and that Sheedy's letter advising YGA of the upcoming review, sent approximately eight weeks in advance, gave defendants proper notice of the December 27th inspection. See id. at 216, 218; see also 7 C.F.R. § 210.9(b) (requiring that each school enter into a written agreement providing, *inter alia*, that the school "make all accounts and records pertaining to its school food service available to the State agency . . . for audit and review, at a reasonable time and place"); id. § 210.18(c)(1) (requiring periodic on-site inspections). Nor do defendants maintain that the inspectors had unfettered discretion as, by the terms of the Code of Federal Regulations ("C.F.R."), their authority was limited to "accounts and records pertaining to its school food service." 7 C.F.R. § 210.9(b)(17). The

regulatory scheme thus provided an adequate substitute for a warrant.  See, e.g., Players, Inc.

v. City of New York, 371 F.Supp.2d 522, 538-39 (S.D.N.Y. 2005) (finding third prong of

Burger satisfied where the governing regulations made clear that the receipt of a city license to

run a food service establishment was granted subject to the licensee's agreement to submit to

inspections).

To avoid application of the administrative exception to the warrant requirement,

defendants contend that YGA was not participating in the Program at the time of the inspection

and thus was not subject to the regulatory scheme.[10]  Defendants' argument is factually and

legally flawed.  Pursuant to a 1991 written agreement between YGA and the USDA that was

entered into evidence, YGA was accepted for enrollment in the breakfast Program.  See Govt.

Ex. 1.[11]  Although the agreement reflecting YGA's initial enrollment in the lunch Program

could not be located,[12] standard protocol required such an agreement before the DOE would

provide reimbursements, Tr. at 22, 24, and YGA had been receiving reimbursement for both

lunches and breakfasts for a number of years. See Def. Ex. D (summarizing reimbursements

provided to YGA for its participation in the breakfast and lunch programs during the academic

_____

[10]  In his most recent submission, which followed the government's belated disclosure of
additional DOE discovery materials, Sorcher acknowledged that YGA continued to receive
funds and commodities under the Program during the 2000-2001 school year.  See 3/20/07
Stern Letter.  However, as the defense has not expressly withdrawn its previous argument, the
Court will address it on the merits.

[11]  Under the terms of this agreement, in language that mirrors that of the C.F.R., YGA agreed
to "make available to the State Education Department . . . for examination and audit, and
administrative review, at any reasonable time and place, all accounts and records pertaining to
the operation of the program." Govt. Ex. 1 ¶ 13.

[12]  DOE has a seven-year document retention policy.  Tr. at 22.

years from 1997 through 2000). Furthermore, the annual renewal forms all indicate YGA's participation in both the breakfast and lunch programs. See Govt. Exs. 2(a)-(I). The 2000 renewal form reflects the school's enrollment in both aspects of the Program, and contains a certification, signed by Sorcher, indicating his agreement to "comply with all applicable Federal and State laws and regulations, including [7 C.F.R. § 210]," which required all approved schools to enter into a written agreement with the governing State agency. See Govt. Ex. 2(I); 7 C.F.R. § 210.9(b).[13]

Citing the fact that the 2000 renewal form does not indicate that it was approved by the DOE, see Govt. Ex. 2(I), defendants argue that YGA was not participating in the Program at the time of the inspection on December 27, 2000. See Def. Mem. at 18; Tr. at 212. To be sure, no signature appears on the document in the area provided for DOE approval; nevertheless, a stamp in the upper left corner indicates that the DOE received the application on November 22, 2000. See Govt. Ex. 2(I); Tr. at 189. No reason appears in law or logic why the voluntarily filed renewal form did not, in and of itself, subject YGA to the review authority of the DOE. Moreover, Sheedy credibly testified that the DOE automatically approved renewal applications upon receipt thereof. Tr. at 103. Consequently, YGA continued receiving reimbursements and delivery of bulk food under the Program after the DOE received the renewal application. See Letter to Judge Gershon dated March 5, 2007, from Daniel D. Brownell, Esq., at 2-3, and attachments thereto. Accordingly, the evidence

---

[13] The seven renewal forms covering the academic years from 1991 through 1999 also include a similar certification, signed by Sorcher, that he had "read the school lunch . . . agreement[] and agree[d] to carry out the terms therein." Govt. Exs. 2(a)-(h).

establishes that YGA was participating in the Program at the time of the search.

In any event, whether or not YGA was then participating in the Program, there is ample evidence that Sheedy was "acting in objectively reasonable reliance" on the regulatory scheme. See Illinois v. Krull, 480 U.S. 340, 349, 356-60 (1987); see also United States v. Bin Laden, 126 F.Supp.2d 264, 283-84 (S.D.N.Y. 2000) (refusing to apply exclusionary rule where investigating offers acted in "actual and reasonable belief that Attorney General approval [for electronic surveillance] was not required"); United States v. Bell, Nos. 93-5933, 93-5952, 1994 WL 362073, at *7 (6th Cir. 1994) (upholding warrantless administrative search of unlicensed private club where officers were under an objectively reasonable impression that the club was licensed and subject to inspection). As Sheedy testified, at the time of the inspection, YGA was due for its periodic review, which occurred every five years. Tr. at 12, 37, 40; Govt. Ex. 5. Furthermore, prior to Sheedy's site visit, the DOE had received a renewal application from YGA. Govt. Ex. 2(I). These facts made Sheedy's assumption that YGA was "participating" in the Program at the time of the inspection objectively reasonable, particularly in the absence of any evidence that Sorcher or any other representative of the school advised her otherwise.

Defendants additionally argue that the inspection was investigatory in nature and does not qualify for the administrative search exception. See 2/20/07 Stern Letter. The Court rejects this contention on both the facts and the law. Sheedy testified convincingly that the inspection was a routine periodic review, see Tr. at 40; that the DOE had begun withholding reimbursements from YGA due to its failure to file an updated tax form does not undermine

her entirely credible assertion. See id. at 129, 224-25; see also 3/20/07 Stern Letter at 1 (acknowledging that the DOE "did not entirely discontinue reimbursement of money and delivery of commodities to YGA"). Furthermore, even assuming that the evidence supported the defense contention, the law is clear that absent a demonstration of bad faith, an agency is permitted to conduct an administrative inspection "for the simultaneous pursuit of an administrative objective and the gathering of evidence for criminal purposes if the administrative inspection is authorized and legitimate." United States v. Funaro, 253 F.Supp.2d 286, 296-97 (D. Conn. 2003); see United States v. Gel Spice Co., 773 F.2d 427, 432 (2d Cir. 1985) ("[E]ven if the [agency] were pursuing criminal enforcement of the [governing statute] at the time of the inspections in question, standing alone this does not imply or suggest that the inspections were conducted in bad faith."); cf. Burger, 482 U.S. at 716 (refusing to find administrative scheme unconstitutional "simply because, in the course of enforcing it, an inspecting officer may discover evidence of crimes, besides violations of the scheme itself. . . . The discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect."). The out-of-circuit cases cited by defendants are thus distinguishable in that, unlike the present case, they involved alleged administrative searches that were found to be pretextual, see, e.g., Alexander v. City of San Francisco, 29 F.3d 1355, 1360 (9th Cir. 1994); Winters v. Bd. of County Comm'rs, 4 F.3d 848, 854 (10th Cir. 1993); United States v. Johnson, 994 F.2d 740, 743 (10th Cir. 1993); or that exceeded the scope of a bona fide administrative search, see United States v. Limatoc, 807 F.2d 792, 794-95 (9th Cir. 1987).

### 2. Consent

Even assuming *arguendo* that the review did not fall within the administrative search exception, there is ample evidence to indicate that Sorcher consented to the on-site inspection. The government bears the burden of proving by a preponderance of evidence that the proponent of a motion to suppress consented to the search or seizure. See United States v. Isiofia, 370 F.3d 226, 230-31 (2d Cir. 2004). "Whether consent was given voluntarily is an issue of fact, to be determined by the trial judge, [based on] findings from all of the appropriate and relevant circumstances." United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973)). "Moreover, it is well settled that consent may be inferred from an individual's words, gestures, or conduct." Id. "Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" Id.; see also United States v. Taylor, 279 F.Supp.2d 242, 245 (S.D.N.Y. 2003) ("[T]he validity of a search does not depend on the recitation of a 'talismanic phrase' . . . .") (citing Buettner-Janusch, 646 F.2d at 764); Murray v. McClellan, 91 CV 4609 (SJ), 1992 U.S. Dist. LEXIS 21277, at *10 (E.D.N.Y. 1992) ("Permission to enter the apartment was implicit from her actions, even though she did not [say] 'You have my permission to search.'").

All of Sorcher's conduct on the day of the inspection demonstrates that he voluntarily subjected YGA to the review conducted by Sheedy and Franklin. Sheedy testified without contradiction that Sorcher acknowledged her as she entered the school and indicated that she should wait until the prayer service had concluded. Tr. at 59-60. Sorcher thereafter brought

her several manilla envelopes containing the documents she had requested in her 11/6/06 Letter, and left them with her to review while he fed the students. Id. at 61-62. That Sorcher presented Sheedy with the documents sought along with a copy of the Checklist further demonstrates that upon her arrival, he was fully cognizant of and unopposed to the nature of her visit.[14] See id. at 228-29. A reasonable person in Sheedy's position would thus have believed that Sorcher consented to her presence at the school and her review of those documents that he freely relinquished to her. See United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) (consent to search house may be found based on agents' reasonable belief that defendant had invited them into his home); see also United States v. Deutsch, 987 F.2d 878, 883 (2d Cir. 1993) (defendant's invitation to agents to talk in his living room constituted consent to enter the home); Krause v. Penny, 837 F.2d 595, 597 (2d Cir. 1988).[15]

Accordingly, Sheedy and Franklin's inspection of YGA in no way violated defendants' Fourth Amendment rights. See generally Apollo Fuel Oil v. United States, 195 F.3d 74, 77 (2d Cir. 1999) (finding no Fourth Amendment violation where "there was ample evidence that [the compliance inspector] was on [the] premises pursuant to a regulatory scheme and with [the

---

[14] Indeed, Sorcher's defense counsel initially conceded at the evidentiary hearing that by presenting the documents to Sheedy, Sorcher consented for her to review them. See Tr. at 208; but see id. at 219-20 (arguing later that Sheedy and Franklin's very presence was unauthorized).

[15] Notably, Sorcher protested Sheedy's request for records for the period from October through December 2000 – thus confirming that his production of the September records without protest constituted his consent to her review of them. See Tr. at 94. Furthermore, the record is barren of any evidence or contention that Sheedy and Franklin gained access to YGA or its records by means of threat or coercion. Cf. Schneckloth, 412 U.S. at 227 (in determining the voluntariness of consent, courts must balance the legitimate need for the search against "the equally important requirement of assuring the absence of coercion").

owner's] consent").

## B. The Removal of the Documents

Having concluded that the warrantless administrative review conducted by Sheedy and Franklin was valid under the Fourth Amendment, the Court must next determine whether Sheedy's removal of the documents that Sorcher presented to her constituted an unreasonable seizure. At the hearing, defendants argued, for the first time, that because the federal regulations do not specifically provide for the agency's retention of records that it reviews, the government cannot rely on the administrative exception in support of the removal of the documents. Tr. at 209. Defendants further contend that by advising Sorcher that she was taking the documents, rather than requesting his permission to do so, Sheedy seized the documents without his consent. Id. at 207; see generally Def. Mem. at 17. However, as defendants had no reasonable expectation of privacy in the documents removed by the DOE, their Fourth Amendment claim must fail. In addition, under the circumstances, it was reasonable for Sheedy to infer that Sorcher consented to the removal of the documents, even though he did not expressly state his consent.

### 1. No Reasonable Expectation of Privacy

In order to establish that their Fourth Amendment rights were violated, defendants must demonstrate not only that the "seizure" was illegal but also that they had a legitimate expectation of privacy in the subject of the seizure. See Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); Rakas v. Illinois, 439 U.S. 128, 131 n.1 (1978); United States v. Zapata-Tamallo, 833 F.2d 25, 27 (2d Cir. 1987); United States v. Hall, 419 F.Supp.2d 279, 283 (E.D.N.Y.

2005). The determination as to defendants' expectation of privacy involves two separate inquiries – first, whether defendants in fact sought to preserve the documents as private, thereby demonstrating an "actual [or] subjective[] expectation of privacy" in the subject of the seizure; and second, whether defendants' expectation is "one that society is prepared to recognize as reasonable," that is, an expectation that is objectively justifiable under the circumstances. See Smith v. Maryland, 442 U.S. 735, 740 (1979) (quoting Katz v. United States, 389 U.S. 347, 351, 361 (1967) (majority and concurring opinions)) (internal quotations omitted); see also United States v. Titemore, 437 F.3d 251, 256 (2d Cir. 2006); United States v. Chuang, 897 F.2d 646, 649 (2d Cir. 1990). In the present case, defendants have not met this burden.

### a. No Actual or Subjective Expectation of Privacy

The evidence does not support a claim that defendants intended to keep the subject documents private from the DOE. Defendants did not claim to have made efforts to avoid disclosure of the documents. Cf. United States v. Salameh, No. S5 93 Cr. 0180 (KTD), 1993 WL 364486, at *5 (S.D.N.Y. Sept. 15, 1993) (finding that defendant demonstrated a subjective expectation of privacy in contents of locked storage shed where defendant retained possession of the keys). Nor could they have done so, as they were required to make the documents available to the DOE on request.

Sorcher's conduct belies any suggestion that he or his co-defendant retained any privacy interest in the documents that Sorcher produced to Sheedy. Sorcher turned the documents over to Sheedy shortly after her arrival at YGA and allowed her to retain and review them for the

remainder of the school day.  See Tr. at 61-62, 93-94.  Sorcher thereafter failed to respond or protest when Sheedy told him of her intent to keep the documents upon her departure from the school.  Id. at 94-95.  Additionally, Sheedy took only those documents that, through its participation in the Program, YGA was required to maintain and produce to the agency on request.  Id. at 94, 176-80; see Chuang, 897 F.2d at 650 (finding that defendant had not demonstrated a subjective desire to keep seized documents private where those documents were "subject to periodic examinations by the [governing agency], which had a statutory duty . . . to examine the affairs of every national bank at least twice a year").

Significantly, defendants proffered no testimony or other evidence that they held a subjective expectation of privacy in the documents.  See United States v. Dinero Express, Inc., No. 99 CR. 975 SWK, 2000 WL 254012, at *5 (S.D.N.Y. Mar. 6, 2000) (denying motion to suppress where defendant "offered nothing to establish that she had a reasonable expectation of privacy in the premises searched or evidence seized"); United States v. Marcos, No. SSSS 87 CR. 598 JFK, 1990 WL 20160, at *10 (S.D.N.Y. Feb. 28, 1990).  Indeed, the record contains no affidavits from defendants asserting their possessory or proprietary interest in the documents.  See United States v. Hamdan, 891 F.Supp. 88, 95 (E.D.N.Y. 1995).  Accordingly, given the nature of the documents, defendants have not "made a sufficient showing of a possessory or proprietary interest" in the materials removed by Sheedy.  Chuang, 897 F.2d at 649.

### b.  No Justifiable Expectation of Privacy

Moreover, even if defendants had demonstrated a subjective expectation of privacy, any

such expectation would not be one that society would accept as reasonable. As a preliminary matter, "the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy." Burger, 482 U.S. at 702; see also Shapiro v. City of Glen Cove, No. CV 03-0280(WDW), 2005 WL 1076292, at *13 (E.D.N.Y. May 5, 2005) (inspection provision in city code governing construction sites "gave rise to a reduced expectation in privacy" in premises under construction). Similarly, where an entity governed by a regulatory scheme maintains documents required by that scheme, its owners or operators have no reasonable expectation of privacy that would protect those documents from seizure by the regulators. See United States v. Szur, No. S5 97 CR 108(JGK), 1998 WL 132942, at *14 (S.D.N.Y. Mar. 20, 1998); see also Chuang, 897 F.2d at 650 ("In view of the pervasive nature of federal regulation of the banking industry, [defendant], as an officer of the bank, knew that bank documents . . . were subject to periodic examination . . . . The existence of a regulatory scheme necessarily reduces a bank officer's expectation of privacy in his corporate office."); United States v. Blocker, 104 F.3d 720, 728 (5th Cir. 1997) (holding that defendant did not have "any reasonable expectation of privacy" in records where investigator "was authorized by statute and by [defendant] to search [the company's] records"); McLaughlin v. A.B. Chance Co., 842 F.2d 724, 726 (4th Cir. 1988) (no reasonable expectation of privacy in forms held pursuant to regulatory scheme).

The Second Circuit's decision in Chuang is instructive. Acting pursuant to information from an informant, the Office of the Comptroller of the Currency ("OCC") conducted an unannounced, warrantless examination of a bank of which Chuang was chairman, president

and CEO.  <u>Chuang</u>, 897 F.2d at 647.  Chuang was subsequently convicted on a number of counts, including making false statements to regulatory officials and agencies (one of the same statutes under which defendants are charged in the present case).  <u>Id.</u> at 648.  Chuang appealed, claiming that the district court erred in denying his motion to suppress evidence obtained during the search.  <u>Id.</u> at 647.  The Second Circuit affirmed, holding that Chuang had not established "a legitimate expectation of privacy in the bank documents examined by the OCC."  <u>Id.</u> at 649.  Because Chuang knew that the bank records "were subject to periodic examination," and "[t]he existence of a regulatory scheme necessarily reduces a bank officer's expectation of privacy in his corporate office," his expectation of privacy "is attenuated to the point where any warrantless examination of his office pursuant to a regulatory scheme may be reasonable within the meaning of the Fourth Amendment."  <u>Id.</u> (citing <u>Burger</u>, 482 U.S. at 700-02).

Similarly, in <u>Szur</u>, the defendant owned a company that entered into an agreement to sell stock to its customers in exchange for proceeds that were to be paid directly to him.  1998 WL 132942, at *1.  The company's books and records were subsequently examined by the Securities and Exchange Commission ("SEC") and National Association of Securities Dealers ("NASD").  <u>Id.</u> at *13.  Szur moved to suppress the records obtained in the searches as having been seized in violation of his Fourth Amendment rights.  <u>Id.</u>  Judge John Koetl of the Southern District of New York disagreed, holding that "because all of the documents examined by the SEC and NASD examiners were required to be maintained and [presented] to those organizations upon their request, and there is no question that the record keeping and

inspection rights of the SEC and NASD furthered substantial regulatory interests, Szur had no reasonable expectation of privacy in those documents." Id. at *14. In addition, Szur had signed a document that gave him notice of the legal bases for the examination of the documents. Id. The court concluded that, "[g]iven this knowledge, as well as the regulated nature of the securities industry, Szur did not have a reasonable expectation of privacy in the documents that were examined pursuant to the SEC and NASD searches." Id. (citing Blocker, 104 F.3d at 728, and Chuang, 897 F.2d at 650-51).[16]

In the present case, the regulations and the agreement – as well as the renewal applications, which reference the governing C.F.R. provisions – placed defendants on notice that the documents that YGA was required to maintain as a condition of its participation in the Program were subject to periodic review. See 7 C.F.R. § 210.9(b)(17); Govt. Exs. 1, 2(a)-(I). The regulations require participating institutions to maintain all reimbursement claims as well as "all data used in the claims review process," and further to agree to "[m]aintain files of currently approved and denied free and reduced price applications . . . and the names of children approved for free lunches." 7 C.F.R. §§ 210.8(a)(5), 210.9(b)(18). Here, as in Szur, there is no allegation that any of the documents removed from the premises – which included materials used for the school's meal count systems, food production records, families' applications for free or reduced price meals, and roster forms – fell outside of the scope of those required documents. Tr. at 63-66, 178-79.

Finally, defendants have offered no evidence or explanation to support a finding that

---

[16] Notably, as with the present case, the governing regulations in Szur did not explicitly authorize the *seizure* of documents. See 17 C.F.R. §§ 240.17a-3, 240.17a-4.

any expectation of privacy in the documents was objectively justifiable . See United States v. Pena, No. 89 CR. 410 (SWK), 1992 WL 188371, at *3 (S.D.N.Y. July 30, 1992) (denying suppression motion where defendant failed to offer "some explanation of why [he] had an objective[ly reasonable] expectation of privacy" in the area searched). Clearly, society could not accept as reasonable an expectation of privacy in documents that were required to be maintained for the purpose of demonstrating compliance with the Program, which involved the disbursement of federal funds and resources. Even if defendants had met their burden of demonstrating a subjective expectation of privacy, any such expectation, "viewed objectively, is not justifiable under the circumstances." United States v. Paulino, 850 F.2d 93, 97 (2d Cir. 1988). For this reason alone, defendants' motion to suppress the documents obtained from YGA should be denied.

### 2.  Consent

In any event, even if defendants had established a reasonable expectation of privacy, the evidence shows that Sheedy obtained Sorcher's consent to remove the documents from the premises. Sheedy testified that at the conclusion of the visit, she told Sorcher that she was taking the documents he had given her for further review. Tr. at 94, 193. Sorcher did not respond, nor did he ask Sheedy to return the documents. Id. at 94-95.

As discussed *supra*, by his conduct Sorcher clearly consented to Sheedy's review of the documents that he readily handed to her at the beginning of her inspection. The question remaining, then, is whether the government has demonstrated by a preponderance of the evidence that the scope of Sorcher's consent to review extended to Sheedy's removal of the

documents from the premises.  See Isiofia, 370 F.3d at 230-31.  "The standard for measuring the scope [of consent] is that of objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  Florida v. Jimeno, 500 U.S. 248, 251 (1991) (internal quotations omitted).  Unless the consenting party specifies a limitation to the contrary, "objective reasonableness" is defined by "the expressed object of the search."  United States v. Rojas, 906 F.Supp. 120, 130 (E.D.N.Y. 1995); see Jimeno, 500 U.S. at 251.[17]

The announced purpose of Sheedy's review, as indicated by her 11/6/00 Letter, was, among other things, to "evaluate compliance with federal and State laws and regulations in order to effectively monitor the use of federal funds." Govt. Ex. 5(b).  More specifically, the stated objects of her review were enumerated on the Checklist accompanying the letter.  See Govt. Ex. 5(a).  Sheedy thus defined the scope of the review, to which Sorcher then freely consented.  In permitting Sheedy to review the materials he handed her shortly after her arrival, Sorcher in no way expressly or impliedly limited the scope of her review of those documents, which were subject to inspection as records required for participation in the Program.  Sorcher permitted Sheedy to spend the better part of the day reviewing the documents, and did not object when she stated her desire to take the documents with her.  Having obtained Sorcher's consent to the inspection, and having observed discrepancies in the

_____

[17]  Although most cases addressing the scope of consent concern the physical boundary of the location or the specific materials embraced within the consent-to-search, see, e.g., United States v. Snow, 44 F.3d 133 (2d Cir. 1995) (consent to search car extends to readily opened containers discovered inside car), this Court sees no reason why this principle should not apply with equal force to the reasonableness of an inspector's determination that a consent to search also indicated a consent to remove.

course of that inspection, Sheedy could reasonably assume that his consent extended to the removal of the documents from the premises for further review.

Defendants make much of the fact that Sorcher did not expressly consent to Sheedy's professed intent to take the documents on departure. As a general matter, "the failure to object does not constitute consent unless the totality of circumstances so indicates." Taylor, 279 F.Supp.2d at 245. Here, however, the surrounding circumstances strongly indicate that Sorcher's consent encompassed Sheedy's retention of the documents: Sorcher failed to request the return of the September 2000 documents, after having allowed Sheedy to review and retain possession of them throughout her visit; in addition, Sorcher's objection to Sheedy's request for documents for a *different* time period dramatically demonstrates that he was fully aware of the scope of the review and unintimidated by the inspectors' presence. All of these circumstances clearly evidence that Sheedy's removal of the September documents did not exceed the scope of Sorcher's earlier consent. Cf. United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999) ("[A] defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."); United States v. Bruckman, No. CR-90-198E, 1991 WL 255370, at *3 (W.D.N.Y. Nov. 12, 1991) (holding that a failure to object to continuation of a search is "a strong indication that the search was within the scope of the consent which [defendant] intended to give").

Defendants have offered no proof that Sorcher sought to limit the scope of his consent to the inspection of the documents, nor have they established or even argued that his consent

was secured through coercion.  Given the absence of any limiting factors, coupled with defendants' diminished expectation of privacy in the documents, see Burger, 482 U.S. at 702, it was reasonable for Sheedy to believe that Sorcher consented to their removal from the premises.  Cf. Lavin v. Thornton, 959 F.Supp. 181, 191 (S.D.N.Y. 1997); United States v. Perez, 948 F.Supp. 1191, 1201 (S.D.N.Y. 1996) (holding that agents reasonably believed that consent extended to items seized since defendant's father reviewed the items to be seized, did not object to the seizure of the items, and signed a receipt); United States v. Gazzara, 587 F.Supp. 311, 328 (S.D.N.Y. 1984) (holding that consent to seizure of evidence in the nature of contraband or counterfeit currency extended to seizure of address books to which no objection had been expressed).  Accordingly, Sheedy's actions did not violate defendants' Fourth Amendment rights.

## CONCLUSION

For the foregoing reasons, this Court recommends that defendants' suppression motion be denied.

Any objection to the recommendations contained herein must be filed with the Honorable Nina Gershon by April 9, 2007.  Failure to file objections in a timely manner may waive a right to appeal the District Court order.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health & Human Servs., 982 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to docket this Report and Recommendation through the Electronic Case Filing System.

**SO ORDERED**

**Dated:**　**Brooklyn, New York**
　　　　**March 26, 2007**

　　　　　　　　　　**ROANNE L. MANN**
　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**